```
                  UNITED STATES DISTRICT COURT
                   DISTRICT OF MASSACHUSETTS

BOSTON ARCHDIOCESE TEACHERS    )
ASSOCIATION,                   )
     Plaintiff                 )
                               )
          v.                   )      C.A. No. 04-11197
                               )
ARCHDIOCESAN CENTRAL HIGH      )
SCHOOLS, INC., et al.          )
     Defendants                )
```

MEMORANDUM AND ORDER

WOLF, D.J.                                         August 15, 2005


I. SUMMARY

Plaintiff Boston Archdiocesan Teachers Association ("BATA") is an unincorporated labor organization. Complaint, ¶4. Archdiocesan Central High Schools, Inc. ("ACHS") operated eight high schools, including North Cambridge Catholic High School, Cathedral High School, Matignon High School, Pope John XXIII High School, Bishop Fenwick High School, Cardinal Spellman High School, Marion High School, and Archbishop Williams High School (the "High Schools"). Id., ¶8.

At the time it filed this lawsuit, BATA was the exclusively recognized bargaining representative of all lay teachers and counselors at ACHS' High Schools. Id., ¶8. BATA and ACHS had continuous collective bargaining agreements for the past 38 years and, most recently, were parties to a collective bargaining agreement ("CBA") which expired on August 31, 2004. Id., ¶31.

In the fall of 2003, ACHS informed BATA that, as of

September 2004, it would be getting out of the business of secondary education and that the High Schools would in the future be operating independently. Id., ¶8. As a consequence, ACHS refused to negotiate a successor contract with BATA, and asserted that the High Schools would each decide independently whether to recognize BATA.

On June 4, 2004, BATA filed suit against ACHS, the High Schools, and also against Archbishop Sean P. O'Malley as a corporation sole (the "Archbishop"), under §301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. §185. In essence, BATA claims that ACHS, the Archbishop and the High Schools are alter egos and, therefore, that the High Schools are bound by the terms of the CBA. More specifically, BATA claims that ACHS and the Archbishop have breached the CBA by refusing to bargain with BATA and by refusing to require the successor High Schools to recognize and bargain with BATA. In addition, BATA claims that the High Schools have tortiously interfered with a contractual relationship in violation of Massachusetts law by dealing directly with unionized employees.

BATA requests that the court order ACHS and the Archbishop to fulfill their obligations under the CBA by bargaining with BATA and/or by requiring the successor High Schools to recognize and bargain with BATA. Alternatively, BATA requests that the court deem the High Schools to be alter egos of ACHS and,

2

therefore, require the High Schools to recognize and bargain with BATA.

Defendants have moved to dismiss the complaint, primarily pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Defendants contend that the complaint should be dismissed because §301 of the LMRA cannot be interpreted to apply to church-operated schools. A hearing was held on March 4, 2005. For the reasons set forth in this Memorandum, the court finds that §301 does not apply to church-operated schools. Therefore, defendants' motions to dismiss the federal claims in this case are being allowed. The remaining state law claim is being dismissed without prejudice to being reinstituted in the courts of the Commonwealth of Massachusetts.

II. THE FACTS

BATA had been the exclusively recognized bargaining representative of all lay teachers and counselors at ACHS' High Schools for 38 years. Id., ¶31. BATA and ACHS have had continuous collective bargaining agreements throughout that period. Id., ¶11. Most recently, BATA and ACHS were parties to a CBA which, by its terms, ran from September 1, 2002 to August 31, 2004. Id., ¶31.

The CBA contained a Recognition Clause, which provided that ACHS, "or its successor Body recognizes [BATA] for purposes of collective bargaining as the exclusive representative of a unit

consisting of all regularly appointed lay professional teaching and counseling employees of the Archdiocesan Central High Schools, . . . or its Successor Body[.]" Id., ¶34. The CBA also contained a Negotiation Procedure provision, which provided that "[n]ot later than November 1 of the school year at the end of which this Agreement expires, the Corporation agrees to enter into negotiations with [BATA] over a Successor Agreement in accordance with the procedure set forth herein in good faith effort." Id. ¶37. The CBA did not mandate that the parties enter into a new collective agreement, but only that they bargain to do so in good faith. Id.

In the fall of 2003, BATA sought to begin negotiations for a new contract. Id. ¶38. Neil Buckley, Chairman of the Board of Trustees for ACHS, informed BATA that ACHS would not be negotiating a new agreement as ACHS would cease to operate the High Schools effective September 1, 2004. Id. Buckley advised BATA in writing that the High Schools under ACHS were becoming independent of ACHS, and would have local governance. Id., ¶40.

Each of the High Schools was incorporated on or about February 7, 2004. Id. ¶48. The High Schools were incorporated by the Most Reverend Sean P. O'Malley, Archbishop for the Roman Catholic Archdiocese of Boston; Most Reverend Richard G. Lennon, auxiliary bishop of the Roman Catholic Archdiocese of Boston; Sr. Claire Bertero, Secretary of Education for the Roman Catholic

4

Archdiocese of Boston; Sr. Kathleen Carr, superintendent for schools for the Roman Catholic Archdiocese of Boston; and David W. Smith, Chancellor for the Roman Catholic Archdiocese of Boston. Id. ¶49.

The Articles of Organization for each of the High Schools lists Sean O'Malley as Chairman, David Smith as Treasurer and Claire Bertero as Secretary/Clerk. Id. ¶51-58. The Articles provide that the high schools are to defer to the teaching authority of the Roman Catholic Archbishop of Boston, id. ¶59, any priest or chaplain at the School must be assigned by the Roman Catholic Archbishop of Boston, id. ¶60, the curriculum for the School is subject to the approval of the Office of Education for the Roman Catholic Archdiocese of Boston, id. ¶61, and all contracts with employees of the School shall include a provision pursuant to which the employee may be discharged at the discretion of the Roman Catholic Archbishop of Boston. Id. ¶63. In addition, the complaint alleges that there was no change in the ownership of the property of the High Schools, id. ¶65, and that each of the High Schools has retained, among other things, its current principal, pension program, and health benefit programs. Id. ¶70-75. As confirmed at the March 4, 2005 hearing, the parties agree that the High Schools are "church-operated schools."

The complaint also alleges that members of the Boards of

Trustees of each of the High Schools have communicated directly with lay faculty regarding wages, working conditions, hours of work, job benefits, employment status and severance, in violation of the CBA. Id. ¶80-84. On February 20, 2004, counsel for BATA requested that each of the High Schools stop dealing directly with lay teachers. Id., ¶85. In response, on February 24, 2004, counsel for ACHS informed BATA that new corporations had been formed and that counsel for ACHS was now labor counsel for the High Schools.

On March 9, 2004, counsel for BATA met with Archbishop O'Malley, and again requested that BATA be recognized as the bargaining agent for all lay teachers in the High Schools. By letter dated March 20, 2004, Archbishop O'Malley denied BATA's request. He wrote:

> Having considered your request as well as the other factors that have led to the decision to decentralize the management of these eight high schools, it is my firm belief that the decision as to whether or not to recognize BATA is one that rests fundamentally with the boards of these schools as they prepare to move forward as separate and distinct entities apart from ACHS

Id. ¶92.

On March 15, 2004, employees at the High Schools received letters asking that they signify their interest in working for the newly formed corporations. On March 30, 2004, labor counsel for all of the new corporations informed BATA that the new corporations did not intend to bargain with BATA. Noting that

BATA is the exclusive representative of the teachers during the term of the CBA, BATA contends that the schools' direct dealing with employees violates the CBA. Id., ¶100. BATA also argues that the schools violated the CBA by unilaterally changing wages and conditions of employment, and threatening retaliation for union membership.

III. ANALYSIS

For the purposes of defendants' Rule 12(b)(6) motions to dismiss, the court must accept the facts alleged in the complaint as true and dismiss the case only if it appears beyond a reasonable doubt that they state no claim which would entitle the plaintiff to relief. See Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993); Miranda v. Ponce Fed'l Bank, 948 F.2d 41, 44 (1st Cir. 1991). Dismissal of the federal claims in this case is required because, contrary to plaintiff's contention, §301 of the LMRA does not apply to church-operated schools. See Vlaskamp v. Eldridge, 2001 WL 1607065, *2 (S.D.N.Y. 2001); Ferro v. Assoc. of Catholic Schools, 623 F.Supp. 1161, 1165 (S.D.N.Y. 1985).

BATA seeks to enforce the CBA under §301 of the LMRA. The LMRA, enacted in 1947, and commonly known as the Taft-Hartley Act, reenacted the NLRA of 1935 with extensive revisions and additions. See Crilly v. Southeastern Pennsylvania Transportation Authority, 529 F.2d 1355, 1359 (3rd Cir. 1976). The NLRA is now part of the broader LMRA. See 29 U.S.C. §§141(a), 167.

In National Labor Relations Board v. The Catholic Bishop of Chicago, 440 U.S. 490 (1979), the Supreme Court confronted the questions of whether the NLRA invests the National Labor Relations Board (the "NLRB") with jurisdiction over disputes between unions representing lay teachers and church-operated schools and, if so, whether the statute violated the First Amendment of the Constitution. In Catholic Bishop, the Court utilized a test which looks initially at whether application of the statute at issue to a church-operated school would raise serious First Amendment concerns. Id. at 501. If it would, a court must determine whether there was a "clear expression of Congress' intent" to include such schools within the ambit of the statute. Id. at 507; see also DeMarco v. Holy Cross High School, 4 F.3d 166, 169 (2nd Cir. 1993). If a proposed interpretation of a statute would raise serious First Amendment concerns and there is not "such an expression of intent, a court presumes Congress did not intend the statute to apply to the case at issue." DeMarco, 4 F.3 at 169 (citing Catholic Bishop, 440 U.S. at 504-06).

In Catholic Bishop, the Supreme Court addressed whether a church-operated school was an "employer" within the meaning of the NLRA. The court found that:

> The church-teacher relationship in a church-operated school differs from the employment relationship in a public or other nonreligious school. We see no escape from conflict flowing from the Board's exercise of jurisdiction over

>  teachers in church-operated schools and the consequent serious First Amendment questions that would follow.

Id. at 504. Such serious First Amendment issues would arise because, among other things, "[i]nevitably, [the NLRB's] inquiry will implicate sensitive issues that open the door to conflicts between clergy-administrators and the Board, or conflicts with negotiators for unions," id. at 503, and resolution of disputes would "in many instances necessarily involve inquiry into the good faith of the position asserted by the clergy-administrators and its relationship to the school's religious mission." Id. at 502.

Therefore, the Court examined the statute and its legislative history, including the enactment of the LMRA in 1947. Id. at 504-06. The Court concluded that "[t]here is no clear expression of an affirmative intention of Congress that teachers in church-operated schools should be covered by the [NLRA]." Id. at 504.

The Court's reasoning and conclusions are equally applicable to §301 of the LMRA. Section 301 states:

>  Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to amount in controversy, or without regard to the citizenship of the parties.

See 29 U.S.C. §185(a). Therefore, as in Catholic Bishop, it is in this case necessary to determine whether the defendants are

9

"employers" within the meaning of the applicable statute.

This issue raises serious First Amendment concerns. As a threshold matter, it is necessary to determine whether the High Schools are alter egos for the ACHS and the Archbishop. Deciding this question will require consideration of, among other things, "whether the alleged alter ego entity was created . . . to avoid labor obligations." Massachusetts Carpenters Central Collection Agency v. Belmont Concrete Corporation, 139 F.3d 304, 308 (1st Cir. 1998). At the March 4, 2005 hearing, plaintiffs expressed an intent to take the depositions of the Archbishop, several Sisters, and other school officials concerning the alter ego issue if this case survives the motions to dismiss. These depositions will involve the type of inquiry into the "good faith of the position of clergy administrators" that was found to contributed to the finding of serious First Amendment concerns in Catholic Bishop. See 440 U.S. at 502.

If the sole issue were the good faith of the decision to establish the High Schools, this case might not raise serious First Amendment concerns. In doing a Catholic Bishop analysis and concluding that application of the federal Age Discrimination in Employment Act ("ADEA") to church-operated schools was intended and permissible, the Second Circuit wrote:

> [C]ourts have recognized an important distinction between the ongoing government supervision of all aspects of employment required under labor relations statutes like the NLRA and the limited inquiry required in anti-discrimination

10

>     disputes. While the NLRB is continuously involved in
>     enforcement of collective bargaining agreements and
>     resolution of labor disputes . . . ADEA actions do not
>     require extensive or continuous administrative or judicial
>     intrusion into the functions of religious institutions. The
>     sole question at issue in an ADEA case is whether the
>     plaintiff was unjustifiably treated differently because of
>     his age.

DeMarco, 4 F.3d at 169-70. Arguably, the alter ego issue in this case is analogous to the issues presented in ADEA cases.

However, if the High Schools are held to be alter egos of ACHS and the Archbishop, BATA requests that they be ordered to comply with the CBA, which requires that the parties bargain in good faith to achieve a new collective bargaining agreement. If negotiations between BATA and any or all of the High Schools did not result in a new collective bargaining agreement, it is foreseeable that the court would be asked to decide whether the responsible religious officials bargained in good faith and, if a bargaining position was said to be based on religious doctrine, whether that position was sincere or pretextual.

If negotiations resulted in collective bargaining agreements, it is foreseeable that the court would be repeatedly required to resolve disputes arising under them, which would again require a determination of the good faith of religious officials and, potentially, the sincerity of any stated religious reasons for their positions. In essence, it is likely that the court would be "'continuously involved in the enforcement of collective bargaining agreements and resolution of labor

11

disputes'" concerning church-operated schools. Id. (quoting Catholic Bishop, 440 U.S. at 503). Therefore, applying §301 to church-operated schools would raise serious First Amendment questions not presented by application of the ADEA to them.

In view of the serious question of whether §301 would violate the First Amendment if applied to church-operated schools, it is necessary to determine whether the statute manifests a clear intent to do so. Catholic Bishop, 440 U.S. at 504. It does not.

As explained earlier, the NLRA, which was found in Catholic Bishop, not to apply to church-operated schools, is part of the LMRA. See 29 U.S.C. §§141(a), 167. Significantly, §301 "incorporates by reference the definition of employer contained in §2(2) of the NLRA, 29 U.S.C. §152(2), thereby making this definition in §152(2) applicable to [§301(a)]." Manfredi v. Hazleton City Authority, Water Dep't, 793 F.2d 101, 103 n.1 (3rd Cir. 1986). The use of the identical definitions in two sections of the same statute typically manifests an intent that they be given the same meaning. See Employees of Dept. of Public Health and Welfare, Missouri v. Dept. of Public Health and Welfare, Missouri, 411 U.S. 279, 290 (1973); Hillstrom v. Best Western TLC Hotel, 354 F.3d 27, 33 (1st Cir. 2003).

The legislative history of §301 does not indicate that the term "employer" should be interpreted more broadly with regard to

§301 than with regard to the NLRA. To the contrary, in <u>Catholic Bishop</u> the Supreme Court relied in part on the legislative history of the LMRA in concluding that church-operated schools were not employers for the purpose of the NLRA. <u>See</u> 440 U.S. at 504.

Therefore, as with the NLRA, "[t]here is no clear expression of an affirmative intention of Congress that teachers in church-operated schools should be covered by the Act" at issue. <u>Id.</u> Accordingly, this court must "decline to construe the Act in a manner that could in turn call upon the Court to resolve difficult and sensitive questions arising out of the guarantees of the First Amendment Religion Clauses." <u>Id.</u> at 507. Thus, Plaintiff's claims based on §301 (Counts I, II and III) are being dismissed, pursuant to Rule 12(b)(6), for failure to state a claim on which relief may be granted. <u>See</u> <u>Vlaskamp</u>, <u>supra</u>; <u>Ferro</u>, <u>supra</u>.

The sole remaining claim is that defendants have violated the law of the Commonwealth of Massachusetts by tortiously interfering with contractual relationships. <u>See</u> Count IV. "As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit . . . will trigger the dismissal without prejudice of any supplemental state-law claims." <u>Rodriguez v. Doral Mortgage Corp.</u>, 57 F.3d 1168, 1177 (1st Cir. 1995) (citing <u>United Mine Workers v. Gibbs</u>, 383 U.S.

715, 726 (1966)). There is no reason to depart from this general principle in this case. Therefore, Count IV is being dismissed without prejudice to being reinstituted in the courts of the Commonwealth of Massachusetts.

VI. ORDER

In view of the foregoing, it is hereby ORDERED that:

1. Archdiocesan Central High Schools, Inc., et al.'s Motion to Dismiss (Docket No. 16) is ALLOWED as to Counts I, II, and III of the Complaint, and is ALLOWED WITHOUT PREJUDICE to Count IV of the Complaint being reinstituted in the courts of the Commonwealth of Massachusetts.

2. The Archbishop's Motion to Dismiss (Docket No. 21) is ALLOWED as to Counts I, II, and III of the Complaint, and is ALLOWED WITHOUT PREJUDICE to Count IV of the Complaint being reinstituted in the courts of the Commonwealth of Massachusetts.

                          /s/ Mark L. Wolf
                        UNITED STATES DISTRICT JUDGE